United States District Court
Southern District of Texas
**ENTERED**
January 11, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RAYMOND  COBB, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:14-CV-22 |
| | § | |
| CLINT  MORRIS, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION TO GRANT IN PART AND
DENY IN PART DEFENDANTS' SUPPLEMENTAL MOTION FOR SUMMARY
JUDGMENT**

This is a civil rights case brought by Plaintiff William Casey, a Texas inmate of the Native American faith.  In his original complaint, Plaintiff challenged certain policies and practices of the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID) that he claims conflict with his right to practice his Native American faith in violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq.*, and the First Amendment.

Pending before the Court is Defendants Lorie Davis's and Cliff Morris's supplemental motion for summary judgment (D.E. 28) which incorporated their original motion for summary judgment (D.E. 15).  Plaintiff has responded to both the original and supplemental motions.  (D.E. 27, 29)  For the reasons stated herein, it is respectfully recommended that Defendants' supplemental motion for summary judgment, which incorporates the original summary judgment motion, be GRANTED IN PART and DENIED IN PART.

1 / 31

I.      JURISDICTION

The Court has federal question jurisdiction over this civil action pursuant to 28 U.S.C. § 1331.

II.     PROCEDURAL BACKGROUND

Plaintiff is a prisoner in the TDCJ-CID, and is currently confined at the McConnell Unit in Beeville, Texas.  Plaintiff has been in TDCJ custody since 1997, serving a life sentence for capital murder.  He is housed in general population and has the highest custody classification available for his conviction.  He is therefore able to be out of his cell from 7:00 a.m. until 10:30 p.m., to go to the dayroom, and to take his meals at the chow hall.  He shares a cell with another offender.

In September 2005, Plaintiff began studying the Native American (NA) faith, and in January 2006, Plaintiff became identified on his prison identification card as a practicing member of the NA religion.[1]  Tenets of his faith include: pipe ceremonies in which prayers are offered to the Creator; the wearing of a medicine bag or pouch to protect him from evil; not cutting one's hair except in mourning upon the death of a relative or loved one; and smudging ceremonies for purification.

---

[1] It is acknowledged that neither the term "Native American faith" nor "Native American religion" adequately represents the defined belief system of Plaintiff or any particular Native American practitioner because the faith itself encompass a wide range of beliefs from different tribes and regions.  (*See* Affidavit of Chari Bouse, Contract Native American Chaplain, D.E. 15-6, p. 36, noting "[c]urrently, there are 566 federally recognized tribes… Each tribe has its own specific customs and traditions.  However, there are several 'inter-tribal' customs, and even that varies in tribes from different states.  Native Americans are not religious by nature, but adhere to what we call a 'way of life.'  Our people are 'monotheistic,' meaning we recognize only one Creator God or Deity…").  A running similarity in the Native American faith system is the central relationship of human beings, and their bodies, to the land, nature, reality, and spirituality.  *See Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 460-61 (1988) (J. Brennan, dissenting).

On January 21, 2014, Plaintiff filed his original complaint, naming as defendants: (1) William Stephens, the former TDCJ-CID Director who was subsequently replaced by Lorie Davis; and (2) Native American Program Analyst, Clint Morris.  (D.E. 1, p. 3). Plaintiff alleged that certain TDCJ-CID policies violated his RLUIPA and First Amendment rights by prohibiting him from practicing his faith.  Specifically, Plaintiff claimed that the TDCJ-CID had implemented three policies that prevented him from (1) growing his hair long or alternatively, maintaining a kouplock, which is a continuously growing one inch square section of hair at the base of the skull; (2) wearing a religiously significant "medicine bag" at all times; and (3) smoking a prayer pipe during Native American pipe ceremonies.  (D.E. 1, pp. 6-7).

Plaintiff sought injunctive and declaratory relief for his RLUIPA claims to allow Plaintiff to: (1) grow his hair long and/or wear a kouplock; (2) wear his medicine bag at all times; and (3) possess and smoke a personal prayer pipe.  (*See* D.E. 1, p. 7).  Plaintiff further seeks monetary relief against Mr. Morris in his individual capacity, alleging that he violated Plaintiff's First Amendment rights because he failed to advocate for Native American programs and failed to make the communal pipe available on the McConnell Unit.

On March 6, 2014, a *Spears*[2] hearing was conducted, following which service was ordered on Director Stephens in his official capacity and on Mr. Morris in his individual capacity.  (D.E. 9).  On June 23, 2014, Defendants filed their Answer.  (D.E. 10).

---

[2] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

On October 31, 2014, Defendants filed their original motion for summary judgment, seeking dismissal of Plaintiff's RLUIPA and First Amendment claims. Defendants' motion included over 550 pages of evidence offered in an Appendix. (*See* D.E. 15-1 – D.E. 15-7).  Plaintiff did not file a timely response to Defendants' summary judgment motion.

On December 9, 2014, the undersigned issued a Memorandum and Recommendation (December 9, 2014 M&R), recommending that Defendants' summary judgment motion be granted as to all claims.  (D.E. 16).  Based on the uncontroverted summary judgment submitted by Defendants, the undersigned Court found that: (1) the TDCJ policies challenged by Plaintiff – the TDCJ grooming policy, the devotional items policy, and the Native American pipe policy – all imposed substantial burdens on Plaintiff's religious exercise of his Native American faith; and (2) the challenged prison policies nevertheless were the least restrictive means of furthering the TDCJ's compelling interests in maintaining prison security and monitoring costs, such that there are no RLUIPA violations.  (D.E. 16, pp. 17-30).  The undersigned further concluded that Plaintiff's First Amendment claims failed as a matter of law because the protections offered by the First Amendment are more limited than those extended RLUIPA.  (D.E. 16, pp. 30-33).

Two days after the December 9, 2014 M&R was issued, the Court received Plaintiff's motion for an extension of time to file his response to the summary judgment motion.  (D.E. 17).  On December 12, 2014, the undersigned stayed this case pending the

Fifth Circuit Court of Appeals' decision in *Davis, et al., v. Pierce*, No. 14-40339 (appeal of *Davis, et al., v. Pierce,* Cause No. 2:12-cv-166 (S.D. Tex, February 27, 2014)).   (D.E. 18).  Plaintiff's motion seeking an extension of time to file a response was denied without prejudice.  (D.E. 18).  The undersigned instructed Plaintiff that, once the Fifth Circuit reached a decision in *Davis*, he would be given an opportunity to file a response to Defendants' summary judgment motion.  (D.E. 18).

On June 14, 2016, the Fifth Circuit issued its decision in the *Davis* case.  *Davis v. Davis*, 826 F.3d 258 (5th Cir. 2016).  That case specifically involved two Texas inmates of the Native American faith, Teddy Davis and Robbie Goodman.  These plaintiffs had filed a civil rights action in this Court, advancing RLUIPA and First Amendment claims virtually identical to Plaintiff's claims in this case.  *See Davis v. Pierce, et al.*, Civil Action No. 2:12-cv-166.  On February 27, 2014, this Court granted defendants' summary judgment motion and dismissed Plaintiff's RLUIPA and First Amendment claims with prejudice.  *Davis v. Pierce*, No. 2:12-CV-166, 2014 WL 798033, at *19 (S.D. Tex. Feb. 27, 2014).  The Fifth Circuit on appeal affirmed the dismissal of Davis's and Goodman's medicine bag and pipe claims, but remanded their kouplock claim to this Court.  *Davis*, 826 F.3d at 266-70.

On July 26, 2016, the undersigned vacated the stay in this case, recognizing that the *Davis* case resolved some, but not all, of the issues in this case.  (D.E. 23).  The undersigned further directed Plaintiff to show cause why judgment should not be entered against him as to his First Amendment claims for monetary relief against Defendant Morris in his individual capacity, as well as his RLUIPA claims that he should be

permitted to smoke a personal prayer pipe and carry his medicine bag at all times.  (D.E. 23, p. 1).  Lastly, as to Plaintiff's RLUIPA claim that he be allowed to grow his hair, or maintain a kouplock, the undersigned directed the parties to file supplemental motions for summary judgment.  (D.E. 23, p. 2).

On September 20, 2016, Plaintiff filed his 143-page response to the original summary judgment motion.  (D.E. 27).  On September 28, 2017, Defendants Davis and Morris filed their supplemental motion for summary judgment addressing Plaintiff's RLUIPA claim that he be allowed to wear his hair either long or in a kouplock.  (D.E. 28).  Plaintiff subsequently filed his response to Defendants' supplemental summary judgment motion.  (D.E. 29).

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not

weigh the evidence, or evaluate the credibility of witnesses. *Id.* Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## IV. PLAINTIFF'S RLUIPA CLAIMS

Section 3 of the RLUIPA concerns institutionalized persons and states:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1)  is in furtherance of a compelling governmental interest; and

(2)  is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a).  The Act broadly defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A).

RLUIPA, which provides a private cause of action, *id.,* § 2000cc-2(a), implements a burden-shifting framework. *Ware v. Louisiana Dep't of Corrections*, 866 F.3d 263, 268 (5th Cir. 2017); *Chance v. Tex. Dep't of Crim. Justice*, 730 F.3d 404, 410-11 (5th Cir. 2013).  The plaintiff's initial burden is two-fold: he or she must show that (1) the relevant religious exercise is "grounded in a sincerely held religious belief" and (2) the government's action or policy "substantially burden[s] that exercise" by, for example

forcing the plaintiff "to 'engage in conduct that seriously violates [his or her] religious beliefs.'" *Holt v. Hobbs,* --- U.S. ---, 135 S. Ct. 853, 862 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.,* --- U.S. ---, 134 S. Ct. 2751, 2775 (2014)).  If the plaintiff caries this burden, the government bears the burden of proof to show that its action or policy (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that interest.  42 U.S.C. § 2000cc-1(a); *Holt,* 135 S. Ct. at 863.

Despite RLUIPA's express purpose to protect the religious observances of individualized persons, the statute does not give courts carte blanche to second-guess the reasoned judgments of prison officials.  Indeed, while Congress enacted the RLUIPA to address the many "frivolous or arbitrary" barriers impeding institutionalized persons' religious exercise, it nevertheless anticipated that courts entertaining RLUIPA challenges "would accord 'due deference to the experience and expertise of prison and jail administrators.'" *Cutter v. Wilkinson,* 544 U.S.709, 716-17 (2005) (*quoting* 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sens. Hatch and Kennedy on the RLUIPA)).  The Supreme Court has cautioned that "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety," and "an accommodation must be measured so that it does not override other significant interests." *Id.* at 722.  The Supreme Court further instructed:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, context matters in the application of that standard.  Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and

security in penal institutions.  They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

*Id.* at 722-23 (internal quotation marks and citations omitted).  This deference is not, however, unlimited, and "policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the Act's requirements." *Rich v. Secretary, Florida Dep't of Corrections,* 716 F.3d 525, 533 (11th Cir. 2013) (internal quotation marks omitted).

### A.    RLUIPA Claims Resolved by *Davis*

In his response to the original summary judgment motion, Plaintiff extensively argues pursuant to RLUIPA that the challenged TDCJ policies imposed substantial burdens on his religious exercise of his Native American faith and were not the least restrictive means of furthering the TDCJ's compelling interests.  (*See* D.E. 27). Plaintiff's RLUIPA claims involving the medicine bag and personal prayer pipe, however, are foreclosed by the Fifth Circuit's decision in *Davis*.

As noted above, *Davis* involved two Texas inmates of the Native American faith who advanced RLUIPA claims in this Court virtually identical to Plaintiff's claims in this case.  This Court concluded that the policy restrictions on wearing medicine bags and banning communal and individual prayer pipes were the least restrictive means in furthering compelling TDCJ interests such as security, controlling costs, and preventing the spread of diseases.  *Davis*, 2014 WL 798033, at *10-12, 17.  The Fifth Circuit

affirmed the district court's granting of summary judgment on the plaintiffs' medicine-bag RLUIPA claim and pipe ceremony RLUIPA claim. *Davis*, 826 F.3d at 266-67.

Plaintiff provides no argument to attempt to show cause in light of *Davis* why judgment should not be entered against him on his RLUIPA medicine bag claim. Because *Davis* forecloses relief for Plaintiff on this claim, the undersigned respectfully recommends that Plaintiff's RLUIPA medicine bag claim be dismissed with prejudice.

With regard to the issue of smoking a personal prayer pipe, Plaintiff contends that he has produced evidence not submitted in *Davis* to show that he should be permitted to smoke a personal prayer pipe. (D.E. 27, p. 33; D.E. 27-1, p. 1). Specifically, Plaintiff has submitted excerpts from the TDCJ's Chaplaincy Manuel dated May 1996, regarding the Native American prayer pipe ceremony. (D.E. 26-1, pp. 2-3). Plaintiff states that "the Texas prison system is under a contractual Agreement to allow all their Native [A]merican inmates to buy their own personal prayer pipes and store them in the chaplaincy dep't from one ceremony to the next." (D.E. 27, p. 33). According to Plaintiff, the TDCJ's ban on inmates smoking their own prayer pipe belies the 1996 contractual agreement. (D.E. 27-1, p. 1).

In *Davis*, the Fifth Circuit explained that the Chaplaincy Manuel was revised in July 2012 to reflect a policy change that only the Native American chaplain, due to health concerns, could smoke the prayer pipe during the pipe ceremony. *Davis*, 826 F.3d at 267. The *Davis* court reaffirmed its holding from an earlier case that the:

> TDCJ had carried its burden of demonstrating that the policy banning communal and individual pipes and allowing only the ceremony leader to smoke the pipe at ceremonies was the least restrictive means of furthering

> compelling government interests in "prison health, administration, and
> security," and, accordingly, did not violate RLUIPA.

Id. (citing *Chance*, 730 F.3d at 412-13).  While recognizing that the TDCJ and the district

court had considered allowing inmate owned prayer pipes to be stored in the chaplain's

office, the Fifth Circuit concluded that the "logistical, health, and security concerns

outweighed the need for a religious accommodation."  *Id.*

Plaintiff's submission of evidence relating to the TDCJ's outdated policy in 1996

fails to demonstrate the requisite cause to show why judgment should not be entered

against him with respect to his RLUIPA prayer pipe claim.  Because *Davis* forecloses

relief for Plaintiff on this claim, the undersigned respectfully recommends that Plaintiff's

RLUIPA prayer pipe claim be dismissed with prejudice.

### B.    RLUIPA Grooming Policy Claim

#### (1)  The Summary Judgment Evidence

Upon entering the TDCJ-CID, every offender is provided with a copy of the TDCJ

Offender Orientation Handbook (Handbook).  (D.E. 15-4, pp. 10-121).  The Handbook

provides general information about prison life and also provides more specific

information about expected standards of conduct, disciplinary procedures and rules, and

grievance procedures for offenders.  For example, the Handbook includes a grooming

policy mandating that offenders maintain "good personal hygiene," brush their teeth

daily, and be clean-shaven.  (D.E. 15-4, p. 30).  As to hair length, the grooming policy in

effect at the time this case was filed stated:[3]

> Male offenders must keep their hair trimmed up the back of their neck and
> head.   Hair must be neatly cut.   Hair must be cut around the ears.
> Sideburns will not extend below the middle of the ears.   No block style,
> afro, natural or shag haircuts will be permitted.   No fad or extreme
> hairstyles /haircuts are allowed.   No mohawks, tails, or designs cut into the
> hair are allowed.

(D.E. 15-4, p. 30).

In support of the grooming policy, Defendants offer the expert report of Cody

Ginsel, the TDCJ-CID Director of Correctional Training and Staff Development, who has

been employed by the TDCJ for twenty-four years.   (D.E. 15-2, pp. 69-114).   He is

currently responsible for ensuring that TDCJ correctional and staff members receive the

information and skills necessary to perform their duties safely and correctly.  (D.E. 15-2,

p. 73).  As to Plaintiff's request to grow his hair or a kouplock, Mr. Ginsel states that this

request "causes security concerns."   (D.E. 15-2, p. 93).   Contraband is frequently

encountered by correctional officers, and offenders could hide "a cell phone or a SIM

card in a braid or long hair.  Similarly, an offender could use a braid to conceal and carry

an edged weapon such as a shank or a knife."  *Id.*  Mr. Ginsel continues:

> If offenders were permitted to have hair longer than collar length,
> correctional officers would then be required to search through an offender's
> hair numerous times each day, due to the fact that offenders are constantly
> moving around a prison unit.   It should be noted that correctional officers
> are trained, for safety purposes, to always keep an arms-length distance

---

[3] Defendants recently informed the Court that TDCJ's grooming policy changed, effective November 2, 2017, to
permit inmates to wear a religious beard up to four inches and to eliminate the requirement that inmates with a
religious beard to shave once per year for annual photographs.  (D.E. 34, p. 2).   Defendants, however, have not
submitted any evidence to confirm this new policy became effective on November 2, 2017.   Furthermore, such
policy involving beard length does not appear to impact Plaintiff's claims in this case, as he seeks permission either
to grow his hair long or to wear a kouplock in the back.

> between themselves and the offenders.  Hair searches would require an officer to stand within that strike zone to conduct a search which could lead to a significant increase in offender assaults on officers.  Further, a search through an offender's hair is an even more personal and intimate search than the standard strip searches that are a part of daily prison life.  It would involve correctional officers regularly placing their hands on the offender's face and scalp, something that would be perceived as significantly more intrusive by offenders and result in significant rise in incidents between offenders and correctional officers.

(D.E. 15-2, pp. 93-94).

Mr. Ginsel states also that conducting these searches would require correctional officers to spend additional time searching offenders' hair that would otherwise be spent in supervision of the total offender population.  (D.E. 15-2, p. 94).  This has consequences on the need for prison staffing.  (D.E. 15-2, p. 94).  If time constraints arise, a correctional officer may use a less secure approach, which could result in problems.  (D.E. 15-2, p. 94).  Conversely, officers may need to call for supervisors for clearance to perform a search which takes time.  (D.E. 15-2, p. 94).

Mr. Ginsel speculates that, if Native American prisoners are allowed to grow their hair or wear a kouplock, then other faith groups, such as certain Jewish or Muslim sects, might seek to grow their hair or wear braids, all of which would burden the operations of the prison.  (D.E. 15-2, p. 94).  Mr. Ginsel concludes: "I predict that if offenders had long hair, correctional staff at the McConnell unit would be under such pressure to move offenders through they would simply not search offenders' hair during pat searches.  The pace required would degrade each component of the search, as correctional officers would be tempted to rush through portions of the search to move the offender along." (D.E. 15-2, p. 95).

Defendants also offer the testimony of Jennifer Gonzales, Assistant Budget Director of the TDCJ Business and Finance Division. (D.E. 15-7, pp. 17-20). Based on the time estimations provided by the TDCJ experts, Ms. Gonzales calculated that the annual cost to search all McConnell Unit inmates if the current grooming policy was abandoned would be approximately $150,668.35. (D.E. 15-7, p. 18).

In support of their supplemental summary judgment motion, Defendants offer the testimony of the McConnell Unit's Senior Warden Matt Barber. (D.E. 28-1). Warden Barber states that Plaintiff has been in TDCJ custody since February 27, 1997. (D.E. 28-1, p. 3). Since his arrival in the TDCJ, Plaintiff has received two minor disciplinary cases, with the first offense for being out of place occurring on July 29, 2005, and the second offense for possession of contraband occurring on February 4, 2016. (D.E. 28-1, p. 3). According to Warden Barber, Plaintiff's disciplinary convictions describe behavior that pose a threat to the safe and orderly operation of the McConnell Unit. (D.E. 28-1, p. 4).

Warden Barber testified that each TDCJ "offender is assigned a custody designation which indicates where and with whom the offender may live, how much supervision he needs, and to which jobs he may be assigned." (D.E. 28-1, p. 4). In evaluating an inmate's custody level, several factors are considered including (1) an offender's current institutional behavior, (2) his current offense and (3) his current sentence length. (D.E. 28-1, p. 4). Disciplinary convictions may negatively affect an inmate's custody designation. (D.E. 28-1, p. 4).

There are six custody classification levels, G1 through G5 as well as administrative segregation. (D.E. 28-1, pp. 4-5). Warden Barber details these custody levels as follows:

> The custody level with the least amount of supervision is G1 custody, which refers to offenders who may live in dorms outside the security fence and may work outside the security fence with periodic unarmed supervision. All offender trusties are classified with G1 custody. Offenders with G2 custody may live in dorms or cells inside the security fence and they may work outside the security fence under direct, armed supervision. G3 custody level refers to offenders who may live in dorms or cells inside the main building of the unit. They are ineligible to live in dorms outside the main building, inside the security fence. They may work outside the security fence under direct, armed supervision. Offenders assigned to G4 custody must live in a cell, with few exceptions, and may work outside the security fence under direct, armed supervision. G5 custody level refers to offenders who have exhibited assaultive or aggressive behavior; those offenders must live in cells and they may not work outside the security fence without direct, armed supervision. Finally, administrative segregation refers to offenders who must be separated from staff and other offenders because they are dangerous or are in danger from other offenders. These offenders generally only leave their cells only for showers and limited recreation.

(D.E. 28-1, pp. 4-5). Warden Barber states that Plaintiff was initially placed in G3 custody status, in which he remained for approximately the first ten years of his sentence. (D.E. 28-1, p. 5). According to Warden Barber, Plaintiff was moved to G2 custody status in March 2007, where he has remained. (D.E. 28-1, p. 5). Warden Barber concludes without offering any evidentiary support that Plaintiff "is not considered a low-risk offender." (D.E. 28-1, p. 5).

Attached to his response to the original summary judgment motion, Plaintiff has included excerpts of Mr. Sullivan's testimony from the *Odneal* trial. (D.E. 26-1, pp. 19-22, Mr. Sullivan, who has fifty-five years of experience in both state and federal prisons,

testified in pertinent part that: (1) allowing inmates to wear kouplocks would result in no change to an inmate's security searches and no additional costs; and (2) performing searches on those inmates wearing kouplocks and beards would have no impact on staffing levels and would be consistent with activities routinely carried out by staff currently assigned and available.  (D.E. 26-1, pp. 19-21).

When asked by the presiding trial judge in *Odneal* about whether the wearing of kouplocks would provide an avenue for smuggling, Mr. Sullivan testified:

> Just my experience, your honor, knowing that there is no contraband enhancement problem created by a kouplock or long hair, or beard.  There is simply no security concern enhancement.

> And again I submit there are 42 states in the nation today that permit that and have no problem.  The United States Federal Bureau of [P]risons that has about 250,000 inmates committed today have no problem.  There's over one-and-a-1/2 million inmates in our United States prisons today that are under prison operations that have, permit long hair, beards, that have no problem.  [sic]

> So I would submit that based on that information, that history, Texas would have no problem either, other than those that they conjure or imagine.

(D.E. 26-1, pp. 19-20).   Plaintiff further included portions of Mr. Sullivan's trial testimony in the *Odneal* case as part of his response to the summary judgment motion.  In this testimony, Mr. Sullivan reiterated that a Native American inmate growing his hair long would present no additional security threat either as to hiding contraband or as to fighting among inmates.  (D.E. 27-2, pp. 12, 23).

### (2) Sincerity of Plaintiff's Beliefs

Plaintiff has the initial burden of showing the sincerity of his NA beliefs.  *See Moussazadeh v. Tex. Dept. of Criminal Justice,* 703 F.3d 781, 790-92 (5th Cir. 2012).

The specific religious practice must be examined rather than the general scope of applicable religious tenets, and the plaintiff's sincerity in espousing that practice is largely a matter of individual credibility. *Id.* at 792. In fact, the sincerity of a plaintiff's engagement in a particular religious practice is rarely challenged. *Id.* at 791. As *Moussazadeh* explains, "[t]hough the sincerity inquiry is important, it must be handled with a light touch, or 'judicial shyness.'" *Id.* at 792 (quoting *A.A. ex rel. Betenbaugh v. Needville Indep. School Dist.,* 611 F.3d 248, 262 (5th Cir. 2010).

In this case, Defendants do not challenge the sincerity of Plaintiff's NA beliefs. At the *Spears* hearing, Plaintiff offered compelling testimony about his understanding of the NA faith, his possession of a gifted piece of antler for which he had to obtain permission from the chaplain and complete property records to possess, and his weekly teachings to others that are new to the faith. Plaintiff has demonstrated he is sincere in the practice of his NA faith.

### (3) Substantial Burden on a Religious Exercise

Under RLUIPA**,** Plaintiff must also demonstrate that a government practice imposes a "substantial burden" on his religious exercise, which requires the Court to determine: (1) whether the burdened activity is "religious exercise," and if so, (2) is the burden "substantial"? *Adkins v. Kaspar,* 393 F.3d 559, 567 (5th Cir. 2004). RLUIPA defines "religious exercise" to include "any exercise of religion," whether or not compelled by, or central to, a system of religious beliefs." *Id.* A government action or regulation creates a substantial burden on a religious exercise if it truly pressures the

adherent to significantly modify his religious behavior and significantly violates his religious beliefs.  *Id.* at 570.

Plaintiff maintains that the TDCJ's grooming policy, which prohibits long hair and/or a kouplock, imposes a substantial burden on his ability to practice his NA faith (D.E. 1, p. 6-7).  Plaintiff testified at his *Spears* hearing that it is a tenet of his faith to grow his hair and to cut it only in times of mourning.  However, the TDCJ grooming policy requires that male offenders must keep their hair trimmed up the back of their neck and head, and also trimmed around the ears.  (D.E. 15-5, p. 30).  If an offender refuses to comply with the grooming standards, he is subject to disciplinary charges that can result in the loss of privileges, and possibly, adversely affect time-earning classification and good time credits.

In similar cases involving NA offenders from the McConnell Unit, this Court determined that the inmate had satisfied his burden at the summary judgment stage that the TDCJ grooming policy substantially burdened the inmate's exercise of his NA faith.  *Casey v. Stephens*, No. 2:14-CV-13, 161 F.Supp.3d 496, 506 (S.D. Tex. 2016); *Cox v. Stephens*, No. 2:13-CV-151, 2015 WL 1417033, at *8 (S.D. Tex. Mar. 27, 2015); *Davis*, 2014 WL 798033, at *9-10.  Furthermore, given the Supreme Court's mandate to examine RLUIPA claims on a fact-specific case-by-case basis, it is respectfully recommended that the Court find that Plaintiff also has met his summary judgment burden to establish that the TDCJ grooming policy places a substantial burden on Plaintiff's religious exercise of his NA faith.

### *(4)  Least Restrictive Means*

Because Plaintiff has established a substantial burden under RLUIPA, Defendants must demonstrate that the challenged policies are the least restrictive means of furthering a compelling governmental interest.  42 U.S.C. § 2000cc-1(a); *Chance*, 730 F.3d at 410; *Garner v. Kennedy*, 713 F.3d 237, 241-42 (5th Cir. 2013).

Plaintiff contends that the TDCJ grooming policy is not the least restrictive means of furthering the TDCJ's compelling interests.  (*See* D.E. 27).  On the issue of whether he should be permitted to grow his hair long or maintain a kouplock, Plaintiff relies in part on the prior testimony and expert report of a retired prison official, George Sullivan, elicited during a trial of another case filed in this Court, *Odneal v. Pierce, et al.*, Civil Action No. 2:04-cv-0454.  (D.E. 27-1, pp. 8-9; D.E. 27-2, pp. 12-17, 19-20, 22-23, 26, 34).

In their supplemental motion for summary judgment, Defendants contend that Plaintiff is not a low-risk offender and that the TDCJ has no other alternatives that are sufficiently protective of TDCJ's compelling interests in safety, security, and the orderly administration of its prison.  (D.E. 28, pp. 3-9).  Plaintiff responds that, based on the competent summary judgment evidence, he is a low-risk offender and that the challenged TDCJ grooming policy is not the least restrictive means of furthering the TDCJ's compelling interests.  (D.E. 29).

*Relevant Case Law*

Before addressing Plaintiff's RLUIPA grooming policy claim, it is instructive to examine recent case law on this issue starting with the *Odneal* case.   Shawn Odneal, an inmate practicing the Native American faith, raised a RLUIPA grooming policy claim similar to the one raised in this case.   The defendants moved for summary judgment on this claim, producing evidence that kouplocks presented security challenges in the areas of inmate identification as well as providing a place for inmates to hide contraband. *Odneal v. Pierce*, No. C-04-454, 2010 WL 3359535, at *2 (S.D. Tex. Aug. 20, 2010). Odneal produced the testimony and expert report from Mr. Sullivan, who countered the defendants' evidence by testifying that kouplocks neither presented security issues nor served as practical places to hide contraband.   *Id.* at *7.   The district court denied the defendants' summary judgment, concluding that genuine issues of material fact existed as to "whether the TDCJ ha[d] a compelling security interest in prohibiting Odneal from wearing a kouplock, and whether the prohibition of a kouplock [was] the least restrictive means."   *Id.* at *8.

Odneal's RLUIPA grooming policy claim proceeded to a bench trial held on December 13-14, 2010.   *See Odneal v. Pierce*, No. C-04-454, 2011 WL 2678940, at *1 (S.D. Tex. Jul. 7, 2011).   However, before the district court could issue a ruling, Odneal was transferred to a Minnesota prison.   *Id.* at *2.   Plaintiff's RLUIPA grooming policy claim was dismissed as moot.   *Id.*

In 2016, the Supreme Court in *Holt* considered a RLUIPA challenge to the Arkansas Department of Corrections' (ADOC) no-beard policy.   The policy prohibited

inmates from wearing facial hair other than a "neatly trimmed mustache." *Holt*, 135 S. Ct. at 860. The policy made no religious exceptions, but did allow inmates with diagnosed dermatological conditions to wear a ¼-inch beard. *Id.* In accordance with his Muslim faith, Gregory Holt sought permission to grow a ½-inch beard. *Id.* at 859, 861. The ADOC denied Holt's request and he filed suit under RLUIPA. *Id.* at 861. Following an evidentiary hearing, the district court dismissed Holt's complaint for failure to state a claim, and the Eighth Circuit affirmed. *Id.* The Supreme Court reversed, holding that ADOC's grooming policy violated RLUIPA *as applied to Holt*. *Id.* at 867 (emphasis added).

The Supreme Court reasoned that the ADOC's stated justification for the policy, preventing the flow of contraband, would not be seriously compromised by permitting Holt to grow a ½-inch beard. *Id.* at 863. In reaching this conclusion, the Supreme Court noted that permitting a religious accommodation to a grooming policy may still allow prison officials to maintain security because RLUIPA allows an institution "to withdraw an accommodation if the claimant abuses the exemption in a manner that undermines the prison's compelling interests." *Id.* at 867.

In *Ali v. Stephens*, 822 F.3d 776 (5th Cir. 2016), a panel of the Fifth Circuit applied *Holt* to affirm a decision out of the Eastern District of Texas granting a Muslim inmate the right to grow a four-inch beard and wear his kufi throughout TDCJ's facilities. In affirming the bench trial decision, the Fifth Circuit reviewed the district court's findings as to the TDCJ grooming policy and evaluated the evidence supporting the TDCJ's concerns over preventing the transfer of contraband, facilitating inmate

22 / 31

identification, controlling costs, and ensuring orderly program administration.  *Id.* at 784-94.  Mr. Sullivan testified as an expert in the *Ali* bench trial that self-searches and visual inspections of longer beards are effective methods for revealing contraband.  *Id.* at 787-88.  After examining the specific exemption requested (a four-inch beard), the Fifth Circuit found that the TDCJ's ban on the wearing of such a beard as to Ali was not the least restrictive means of furthering these interests.  *Id.* at 794

Shortly after *Ali*, the Fifth Circuit issued the *Davis* decision.  The Fifth Circuit vacated and remanded the plaintiffs' kouplock grooming-policy RLUIPA claim because: (1) the record did not reflect whether appropriate consideration was given to Plaintiff's summary judgment evidence, which included Mr. Sullivan's testimony taken from the bench trial in *Odneal*; and (2) there existed a need for further factual findings under *Holt's* standard for evaluating RLUIPA claims.  *Davis*, 826 F.3d at 266-67.

On the issue considering plaintiffs' summary judgment evidence, the Fifth Circuit remarked that excerpts of Mr. Sullivan's testimony contained in the plaintiffs' summary judgment motion may have been relevant to the district court's decision.  *Id.* at 269-70. The *Davis* appellate court determined that:

> While RLUIPA suggests a fact-specific inquiry that takes into account the special circumstances of the individual prisoner and prison, ... this case and *Odneal* involved the same unit within the same prison and prisoners with substantially similar characteristics raising similar challenges to the TDCJ grooming policy. As such, evidence developed in *Odneal's* case could be relevant in the present suit, even under the individualized inquiry standard.

*Id.* at 270.  Because there was no determination by the district court that such testimony was either considered or found to be inadmissible, the Fifth Circuit concluded that remand was appropriate.  *Id.* at 270.

The Fifth Circuit in *Davis* also relied on *Holt* by explaining that "TDCJ's asserted compelling interests must be examined in light of the particular characteristics of each [p]laintiff, including their alleged low security risk status and the particular risks of the specific exemption requested."  *Id.* at 271-72.  As such, the Fifth Circuit found "genuine issues of material fact remain regarding the legitimacy of TDCJ's cost and security concerns created by the wearing of a kouplock by Plaintiffs as low risk Native American inmates, and further because the district court did not consider Plaintiff's grooming-policy claim in light of Plaintiff's individual circumstances."  *Id.* at 272.

On remand in *Davis*, the undersigned addressed the disputed issues identified by the Fifth Circuit.  *Davis*, 2017 WL 896299, at *3-12.  After admitting Mr. Sullivan's testimony for purposes of ruling on the summary judgment motion, the undersigned considered each plaintiff's specific, individual status as low-risk custody inmates in order to determine whether TDCJ's grooming restrictions were unnecessarily applied to them.  *Id*. at 7-12.  After reviewing the evidence, including Mr. Sullivan's testimony, the undersigned determined that a fact issue existed "as to whether TDCJ's grooming policy [was] the least restrictive means of maintaining institutional security without added significant cost to TDCJ."  *Id.* at *12.  The undersigned then withdrew the summary

judgment previously granted on the RLUIPA grooming policy claim and denied the summary judgment motion.  *Id.*

### Marginal-Interest Analysis of Plaintiff's RLUIPA Grooming Policy Claim

In light of *Holt* and the Fifth Circuit's decision in *Davis*, the TDCJ's asserted compelling interests must be examined in light of the particular characteristics of the inmate, including the inmate's security risk status.  *Holt,* 135 S. Ct. at 863; *Davis*, 826 F.3d at 266-67.  The undersigned, therefore, will consider Plaintiff's RLUIPA grooming policy claim in light of Plaintiff's individual circumstances, which includes his particular security classification.

Citing Plaintiff's June 2005 out-of-place conviction and a more recent February 2016 conviction for possession of contraband, Defendants argue that Plaintiff's disciplinary history demonstrates he is not a low-risk offender and should not be given an opportunity to wear long hair or a kouplock.  (D.E. 28, pp. 4-7).  It is important at the outset to note that it is the TDCJ-CID, and not Plaintiff or the courts, which has designated Plaintiff's two disciplinary infractions as "minor" ones.  While in the context of the prison setting, any infraction potentially has an impact on security, and prison authorities have determined that some are major cases while some are minor.

The uncontroverted evidence establishes that, following his capital murder conviction, he was placed initially placed in G3 custody status upon entry TDCJ custody.  (D.E. 28-1, p. 5).  Plaintiff subsequently improved his custody level status to G2 in March 2007.  Plaintiff has never participated in behavior that has caused his custody status level to be increased or otherwise prevented him from being G2 since March 2007.

According to Warden Barber's testimony, one important factor in determining an inmate's custody level is that inmate's *current* institutional behavior.  (D.E. 28-1, p. 4). The competent summary judgment evidence reflects that Plaintiff's last disciplinary conviction occurred almost two years ago, that he has only faced one disciplinary conviction in over twelve years, and that he has received only two minor disciplinary convictions in almost twenty-one years of incarceration.  (D.E. 28-1, p. 3).  Thus, based on the uncontroverted evidence, the undersigned finds that Plaintiff is a low-risk offender.

The undersigned next considers the particular risks associated with the specific exemption requested by Plaintiff, which is being allowed to wear either long hair or a kouplock as part of his Native American faith.   *See Davis*, 826 F.3d at 271-72. According to Defendants, the marginal interest in enforcing the grooming policy is well justified.

Mr. Ginsel, the TDCJ-CID Director of Correctional Training and Staff Development, testified in connection with the original summary judgment motion that: (1) inmates wearing long hair present security concern by concealing weapons in a braid or long hair; (2) prison officials would be forced to search inmate's hair numerous times a day which would take away time otherwise spent in the supervision of the total offender population; (3) staffing needs would increase; (4) other faith groups, such as certain Jewish or Muslim sects, might seek to grow their hair or wear braids, all of which would burden the operations of the prison; and (4) prison staff ultimately would feel pressure not to conduct adequate searches of inmates with long hair, thus causing more security

concerns.  (D.E. 15-2, pp. 93-95).  Jennifer Gonzales, the Assistant Budget Director of the TDCJ Business and Finance Division, calculated that the annual cost to search the hair of all McConnell Unit offenders, if they were permitted to grow their hair past collar length, would be approximately $150,668.35.  (D.E. 15-7, p. 18).

Excerpts of Mr. Sullivan's prior testimony in the *Odneal* case, which are included in and attached to Plaintiff's response to the original summary judgment motion, paint a different picture with regard to the security risks and costs associated with allowing inmates like Plaintiff to wear long hair and/or a kouplock.  Mr. Sullivan testified that allowing inmates to wear long hair and/or kouplocks would result in no change to an inmate's security searches, no additional costs, and no impact on staffing levels.  (D.E. 26-1, pp. 19-21).   Mr. Sullivan rejected the notion that the wearing of long hair and/or kouplocks would provide an avenue for smuggling contraband, noting that prisons permitting kouplocks or long hair have no contraband enhancement problems.  (D.E. 26-1, pp. 19-20; D.E. 27-2, pp. 12, 23).

Both the *Odneal* court and the district court in *Davis* determined Mr. Sullivan's testimony to be credible to the extent that such testimony was not only admissible but also sufficient to defeat the TDCJ Director's respective summary judgment motions as to the RLUIPA grooming policy claim.  *Odneal*, 2010 WL 3359535, at *8; *Davis*, 2017 WL 896299, at *12.  The undersigned similarly finds Mr. Sullivan's expert testimony to be credible as Plaintiff in this case has substantially similar characteristics to the plaintiffs in both *Odneal* and *Davis* and is raising an identical challenge to the TDCJ's current grooming policy.

Even before remanding *Davis* to include an evaluation of Mr. Sullivan's testimony, the Fifth Circuit remarked that the TDCJ had "not demonstrated on the present record that a total ban on the growing of kouplocks, even as to low security risk inmates such as [p]laintiffs, is the least restrictive means of furthering that interest." *Davis*, 826 F.3d at 272. The Fifth Circuit recognized that any accommodation for kouplocks could be withdrawn should the plaintiffs use their kouplocks to smuggle contraband. *Id.*

In this case, as discussed above, Mr. Sullivan highlights his testimony by indicating that no issue exists with inmates hiding contraband in their long hair or kouplocks. Upon consideration of Mr. Sullivan's testimony and the contradictory summary judgment evidence presented by Defendants as to Plaintiff's individual circumstances as well as costs and security concerns, genuine issues of material fact exist regarding whether the TDCJ's grooming policy provides the least restrictive means of allowing Plaintiff to practice his Native American faith. Accordingly, Defendants' original and supplemental summary judgment motions should be denied on Plaintiff's RLUIPA grooming policy claim.

## V.    PLAINTIFF'S FIRST AMENDMENT CLAIM

Plaintiff's First Amendment claim against Defendant Morris is virtually identical to the First Amendment claims raised against the same defendant in *Davis*. This Court in *Davis* concluded that Defendant Morris was entitled to summary judgment because the plaintiffs had not established that their First Amendment rights to exercise their religion had been violated. *Davis*, 2014 WL 798033, at *18-19. The Fifth Circuit affirmed the

dismissal of First Amendment claims. *Davis*, 826 F.3d at 266. Furthermore, in his response to the original summary judgment motion, Plaintiff voluntarily seeks to dismiss his First Amendment claims against Defendant Morris. (D.E. 27-3, pp. 38-39). Accordingly, the undersigned respectfully recommends that Plaintiff's First Amendment claims be dismissed with prejudice.

## VI.   CONCLUSION

Based on the foregoing, the undersigned respectfully recommends that Defendants' supplemental motion for summary judgment (D.E. 28), which incorporates their original motion for summary judgment (D.E. 15), be DENIED IN PART and GRANTED IN PART. The summary judgment evidence establishes that Plaintiff is sincere in the practice of his NA faith and that the TDCJ grooming policy challenged by Plaintiff imposed substantial burdens on Plaintiff's religious exercise. Because the summary judgment evidence establishes a fact issue as to whether the TDCJ's grooming policy is the least restrictive means of maintaining the TDCJ's compelling security and costs interests, the undersigned respectfully recommends that Defendants' supplemental motion for summary judgment be DENIED with respect to Plaintiff's RLUIPA grooming policy claim.

The undersigned further respectfully recommends that Defendants' supplemental summary judgment motion be GRANTED to the extent that: (a) Plaintiff's RLUIPA claims -- that he should be permitted to smoke a personal prayer pipe and carry his medicine bag at all times – be DISMISSED WITH PREJUDICE as foreclosed by the Fifth Circuit's decision in *Davis*; (b) Plaintiff's First Amendment claims be DISMISSED

WITH PREJUDICE as foreclosed by the Fifth Circuit's decision in *Davis* and pursuant to Plaintiff's decision to abandon such claims; and (c) Defendant Morris be DISMISSED WITH PREJUDICE from this action.

In summary, Plaintiff should be allowed to proceed to trial on his RLUIPA grooming policy claim against Defendant Davis.

Respectfully submitted this 11th day of January, 2018.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United* Servs. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).